UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Victoria L. Sura,

Plaintiff,

v.

Stearns Bank, N.A.,
a Minnesota corporation, and
Jan Hanson, individually,

Defendants.

Civil File No. 01-1344 (PAM/RLE)

**MEMORANDUM AND ORDER**

---

Plaintiff alleges that Defendants improperly restructured her job following her return from maternity leave. Accordingly, Plaintiff has filed discrimination and retaliation claims against Defendants under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.01 et seq., and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq.[1] Plaintiff has also filed claims against the individually-named Defendant for aiding and abetting discrimination under the MHRA and tortiously interfering with her employment. This matter is before the Court on Defendants' Motion for Summary Judgment. For the

[1] Plaintiff fails to address her FMLA discrimination claim in her opposition to Defendants' Motion for Summary Judgment. Because "claims under the FMLA do not depend on discrimination," Rankin v. Seagate Techs., Inc., 246 F.3d 1145, 1148 (8th Cir. 2001) (quoting Diaz v. Fort Wayne Foundry Corp., 131 F.3d 711, 712 (7th Cir. 1997)), the Court dismisses this claim without further comment.

DEC 18 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

reasons that follow, the Court grants the Motion in part and denies it in part.

**BACKGROUND**

Defendant Stearns Bank, N.A. ("the Bank") is an independently-owned Bank headquartered in St. Cloud. Defendant Jan Hanson is the Bank's marketing director and the daughter of the Bank's CEO. In the late 1990's, the Bank experienced exceptional growth in its commercial loan department and, as a result of its flourishing business, created several new jobs, including a position for a Business Production Coordinator. Plaintiff Victoria Sura was hired for this position in April 1999. Although Sura had no banking experience, the Bank's management, including Hanson, decided to pay Sura $50,000 a year. The specific details of Sura's job are sketchy at best, but it seems that she was responsible for preparing certain reports about the Bank's commercial loans.

According to the Bank, the sluggishness of the economy in 2000 forced it to reassess the status and quality of its loans. Thus, the Bank's focus shifted from increasing loan volume to improving the quality of its assets. As a part of this shift in emphasis, the Bank eliminated or restructured eighteen positions in loan-related departments. (Mjaancs Aff. Ex. H.) This case arises from the restructuring of Sura's job to an administrative position paying only $36,000 a year.

The parties disagree about whether tensions existed between Sura and Hanson unrelated to the economic downturn of 2000. However, any problems that existed prior to the spring of 2000 were not particularly serious. Indeed, in May 2000, Hanson rated Sura's

performance as "outstanding," and recommended that Sura receive a merit increase in her salary. (Sura Dep. at 116; Egan Aff. Ex. 2; Mjaanes Aff. Ex. X.)

The weight of Sura's Complaint rests on the Bank's alleged mistreatment of her after she became pregnant. In April 2000, Sura informed Hanson that she was pregnant, and on August 16, 2000, Sura officially made her request for eight weeks of maternity leave. (Mjaanes Aff. Ex. Q; Egan Aff. Ex. 6.) At the time that she requested the leave, Sura's due date was November 1, 2000. On September 8, 2000, Hanson called Sura into her office and reprimanded her for discussing the transfer of her duties during her maternity leave with other employees. Hanson had specifically instructed Sura not to have any such discussions until Hanson had reviewed the extent of Sura's duties.

Uncomfortable with this incident, Sura complained to Lee Erickson, the Bank's Director of Human Resources. According to Erickson, Sura expressed concern about taking maternity leave in light of the work environment that she felt Hanson had created. (Erickson Dep. at 35.) Sura also complained to Rick Pankow, the Bank's Chief Financial Officer, and asked for his advice. Pankow testified that Sura was anxious about the timing of Hanson's reprimand in light of her upcoming maternity leave. (Pankow Dep. 22-23.) Defendants, however, ascribe much importance to the testimony of both Pankow and Erickson that Sura did not explicitly complain of discrimination to them. (Erickson Dep. 36, 38-40; Pankow Dep. 54-55.) Additionally, Sura testified that she did not conclude that she had been discriminated against until early January 2001. (Sura Dep. at 190.)

Hanson took a vacation sometime in mid-September. When she returned in late September, she, Sura, and Erickson met to allow a full airing of the tensions created by the incidents on September 8. At this meeting, Hanson apologized to Sura, explaining that she did not hold grudges. (Mjaanes Aff. Ex. I at 4.) Hanson and Sura then began to discuss the changing nature of Sura's job, in light of the new economic climate and the Bank's refocused interest in the quality rather than the quantity of its commercial loans, and Hanson presented Sura with a new draft job description. (Hanson Dep. at 94; Egan Aff. Ex. 10.) Hanson cut the discussion short, however, and decided that they would talk more after Sura returned from maternity leave.

That night, Sura experienced contractions and was hospitalized briefly. Her doctors placed her on bed rest until she gave birth to her child on October 20, 2000. Because of her unexpected hospitalization, Sura revised her leave request at least twice. The end result was that Sura took FMLA leave until December 17, 2000, and vacation time until January 2, 2001. (Egan Aff. Ex. 15.)

According to Pankow, Hanson groused about the amount of leave that Sura was taking. (Pankow Dep. at 33-34, 48-49, 75-76.) Hanson allegedly made similar complaints about two other employees and the maternity time that they were taking. (Id. at 49-50.) Pankow also claims that Hanson told him that she was going to cut Sura's salary and change Sura's job functions to force her to quit. (Pankow Dep. at 41.) In any event, on November 29, 2000, the Bank revised its sick leave policy and drastically reduced the amount of sick

leave allotted to its employees. (Egan Aff. Ex. 16.)

In early December 2000, Sura met with Hanson and another employee, Lynn Roos, to discuss Sura's return to work following her leave. During this meeting, Hanson commented that Sura had been gone for a whole quarter and that this was a long time to be gone. At some point, Roos left the meeting, and Sura avers that Hanson said, "During our last meeting [in late September], I had said that I was a person that did not hold grudges. Well, I lied. I do hold grudges." (Sura Dep. at 213.) Sura also claims that Hanson said that she did not know what she was going to do with Sura and asked if Sura was going to be able to make the necessary adjustments when she returned to work. (Id. at 282.)

In late December 2000, Hanson discussed lowering Sura's salary and changing her job functions with Erickson. On December 27, 2000, Sura learned that she was receiving a $250 bonus for the year, half what she had received in 1999. On January 4, 2001, two days after Sura had returned from her leave, Hanson and Sura met yet again. At this time, Hanson advised Sura that the Bank was restructuring her position effective February 1, 2001, and cutting her salary to $36,000 a year. (Egan Aff. Ex. 22.)

On January 8, 2001, Sura asked to see the formal job description for the restructured position that she was supposed to assume. Sura alleges that the job description was the same as that provided to her by Hanson in the late September meeting. (Egan Aff. Ex. 23.) This is notable, Sura argues, because in the late September meeting, Hanson did not mention that Sura's salary would be cut in any way. Sura resigned on February 1, 2001. (Mjaanes Aff.

Ex. J.) In July 2001, Sura filed the instant action against the Bank and Hanson, claiming that the Bank discriminated against her on the basis of her pregnancy, retaliated against her for complaining about Hanson to Erickson and Pankow, and retaliated against her for taking FMLA leave. Sura also claims that Hanson aided and abetted the Bank's discrimination and retaliation against her. Finally, Sura claims that Hanson tortiously interfered with her employment at the Bank.

**DISCUSSION**

**A. Summary Judgment Standard**

Summary judgment is only proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). Nevertheless, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

The moving party bears the burden of showing that no genuine issues of material fact exist. Enter. Bank, 92 F.3d at 747. Once the moving party has carried its burden, the

nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Because discrimination cases often turn on inferences rather than on direct evidence, courts are more deferential to the nonmoving party alleging discrimination. Webb v. Garelick Mfg. Co., 94 F.3d 484, 486 (8th Cir. 1996). Nevertheless, "if the [nonmoving party alleging discrimination] fails to establish a factual dispute on each element of the prima facie case, summary judgment is appropriate." Weber v. Am. Express Co., 994 F.2d 513, 515-16 (8th Cir. 1993).

**B. Pregnancy Discrimination**

Sura first claims that the Bank discriminated against her because she was pregnant. Title VII, as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), establishes that it is unlawful for an employer to discriminate against an individual "on the basis of pregnancy, childbirth or related medical conditions." 42 U.S.C. §§ 2000e-2(a)(1), 2000e(k). Similarly, the MHRA provides that it is unlawful for an employer to discriminate against an individual "affected by pregnancy, childbirth, or disabilities related to pregnancy or childbirth." Minn. Stat. § 363.03, subd. 1(5). Courts evaluate pregnancy discrimination

claims under the same framework as other intentional sex discrimination cases under Title VII or the MHRA. Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998) (applying the same analysis to pregnancy discrimination claims under Title VII and the MHRA). In order to succeed on her pregnancy discrimination claims, Sura must show that she was "treated differently because of her pregnancy" or a pregnancy-related condition. Deneen v. Northwest Airlines, Inc., 132 F.3d 431, 435 (8th Cir. 1998) (citation omitted).

Sura may establish this discrimination under Title VII through direct or indirect evidence. If she adduces direct evidence of her Title VII claim, then pursuant to Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), "the burden rests with the employer to convince the trier of fact that it is more likely than not that the [employment] decision [at issue] would have been the same absent consideration of the illegitimate factor." Id. at 276.[2]

Although Sura contends that she has direct evidence of pregnancy discrimination, the Court disagrees.

> The direct evidence required to shift the burden of proof is evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision.

Erikson, 271 F.3d at 724. In short, direct evidence only exists if no inference is necessary

---

[2] Sura's MHRA claim is not subject to analysis under the Price Waterhouse framework. Accordingly, Sura's MHRA claim must be analyzed under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Erickson v. Farmland Indus., Inc., 271 F.3d 718, 725 n.2 (8th Cir. 2001) (citing Anderson v. Hunter, Keith, Marshall & Co., 417 N.W.2d 619, 624-27 (Minn. 1988)).

to show that the employer was acting in a discriminatory manner. See id. at 725 (citing Browning v. President Riverboat Casino-Mo, Inc., 193 F.3d 631, 635 (8th Cir. 1998)). Sura claims that the fact that Hanson expressed concern over the length of her leave coupled with Pankow's testimony that Hanson wanted to force Sura to quit by reducing her salary is direct evidence of pregnancy discrimination. Hanson's comments, however, do not directly manifest discriminatory animus aimed at Sura because of her pregnancy. It is just as possible that Hanson was discriminating against Sura because she was taking an extended leave. Because both pregnant and nonpregnant employees might take extended leaves, an inferential leap is required to see Hanson's comments as evidence that she was discriminating against Sura on the basis of Sura's pregnancy or a pregnancy-related condition.

Thus, the Court examines Sura's discrimination claim under the indirect evidence framework of McDonnell Douglas. Sura must, in other words, first establish a prima facie case of discrimination. "The threshold of proof necessary to establish a prima facie case is minimal." Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1022 (8th Cir. 1998). If Sura meets this minimal burden, then Defendants are required to produce a legitimate, nondiscriminatory reason for their actions. If Defendants produce such a reason, the burden shifts back to Sura to show that Defendant's articulated justification is a mere pretext for illegal discrimination. McDonnell Douglas, 411 U.S. at 802-05. Significantly, the ultimate burden of persuasion remains at all times with Sura. Mohr v. Dustrol, Inc., 306 F.3d 636, 640 (8th Cir. 2002).

To establish a prima facie case of pregnancy discrimination, Sura must show that: (1) she was a member of a protected group; (2) she was qualified for her position; and (3) an adverse employment action was taken against her under circumstances giving rise to an inference of discrimination. Bergstrom-Ek, 153 F.3d at 857. There is no question that Sura was qualified for her position and she suffered an adverse employment action. Accordingly, the dispute in this case centers on whether Sura was, at the time of the alleged discrimination, a member of a protected group and whether she was discharged or suffered from some other adverse employment action under circumstances giving rise to an inference of discrimination.

The Court finds that Sura cannot clear the hurdle of showing that she was a member of a protected class at the time of the alleged discrimination. As other courts have noted, pregnancy "differs from most other protected personal attributes in that it is not immutable. While some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions.'" Solomen v. Redwood Advisory Co., 183 F. Supp. 2d 748, 753 (E.D. Pa. 2002). Generally, a woman's status as a new parent, standing alone, is insufficient to establish membership in the protected class for pregnancy discrimination. See Piantanida v. Wyman Ctr., Inc., 116 F.3d 340, 342 (8th Cir. 1997). Rather, a woman who is not pregnant at or very near the time when an adverse employment action is taken against her "must demonstrate that the effects of her pregnancy continued to exist at the time she was [subject to the action], either in actual fact or in the thoughts and actions of those responsible." Solomen, 183 F.

Supp. 2d at 754.

Sura maintains that she suffered from an adverse employment action as early as her meeting with Hanson in September 2000. Sura intimates that she suffered some sort of adverse employment consequence when Hanson presented her with a draft job description at this meeting. Because Sura was pregnant in September 2000, she argues that she has stated a claim for pregnancy discrimination.

The Court disagrees. "An adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." LaCroix v. Sears, Roebuck, & Co., 240 F.3d 688, 691 (8th Cir. 2001); Spears v. Missouri Dept. of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000) (stating that only decisions that result in demotion, reduction in pay, or other tangible job consequences are adverse employment actions). In this case, Sura's salary was not reduced until February 2001, and she has marshaled no argument or factual support for the contention that her responsibilities were significantly reduced when Hanson provided her with the draft job description in September 2000. Because Sura suffered no tangible job consequence until February 2001, she could not have been discriminated against until that time. By February 2001, Sura's child was nearly three and a half months old, and Sura's maternity leave had ended a month and a half earlier. Under these circumstances, the Court declines to find that Sura remained affected by pregnancy or a pregnancy-related medical condition. Accordingly, Sura does not fall within the class of persons protected by the PDA or those provisions of the MHRA

prohibiting pregnancy discrimination. The Court therefore dismisses Sura's pregnancy discrimination claims.

### C. Retaliation

Sura next argues that the Bank retaliated against her for complaining to Erickson and Pankow about Hanson's behavior on September 8, 2000, and for taking FMLA leave. Sura's retaliation claims under Title VII, the MHRA, and the FMLA are analyzed using the same framework. See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002) (stating that McDonnell Douglas analysis applies in FMLA retaliation cases); Herrero v. St. Louis Univ. Hosp., 109 F.3d 481, 483-84 (8th Cir. 1997); Sigurdson v. Isanti County, 386 N.W.2d 715, 719 (Minn. 1986) (stating that analysis for MHRA claims is equivalent to analysis for Title VII claims). Sura admits that she has no direct evidence of retaliation. Accordingly, her retaliation claims must be analyzed using the ubiquitous burden-shifting framework of McDonnell Douglas. See Smith, 302 F.3d at 832; Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 713 (8th Cir. 2000). To establish a prima facie case of retaliation, Sura must establish that: (1) she engaged in a protected activity; (2) her employer subsequently took adverse employment action against her; and (3) the adverse action was causally linked to her engagement in the protected activity. Smith, 302 F.3d at 832; Buettner, 216 F.3d at 713.

1. **Title VII and the MHRA**

Defendants essentially concede, as they must, that Sura suffered from an adverse employment action–her salary was dramatically reduced. With regard to her retaliation claims under Title VII and the MHRA, however, Defendants maintain that Sura cannot show that she engaged in any protected activity. To be a protected activity, an employee must oppose or report conduct that the employee reasonably and in good faith believes relates to an unlawful, discriminatory act or policy of the employer. Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000); Buettner, 216 F.3d at 714. In other words, the employee must demonstrate that she or he had a subjective good faith belief that the conduct reported was discriminatory and that it was objectively reasonable to have this belief. Here, Defendants argue that Sura's admission that she did not believe she was being discriminated against until January 2001, is inimical to her assertion that she had a good faith belief that the conduct she reported to Erickson and Pankow was discriminatory.

Attempting to avoid the trenchant logic of this argument, Sura cites O'Neal v. Ferguson Constr. Co., 237 F.3d 1248 (10th Cir. 2001). O'Neal, however, does nothing to support Sura's claim. Beyond stating the uncontroversial conclusion that an informal complaint may be a protected activity for the purposes of retaliation claims, the court in O'Neal merely found that a letter from the plaintiff's attorney to the defendant characterizing the plaintiff's reassignment to a supply warehouse as retaliatory was entitled to protected status. Id. at 1255. Unlike the plaintiff in O'Neal, Sura did not characterize Hanson's

actions as discriminatory. To the contrary, Sura has admitted that she did not think that Hanson had discriminated against her until January 2001. Under these circumstances, the Court finds that Sura's Title VII and MHRA retaliation claims fail as a matter of law.

**2. FMLA**

Sura, however, states a colorable retaliation claim under the FMLA. Not only did she suffer from an adverse employment action, but by exercising her rights under the FMLA, she engaged in a protected activity. To establish a prima facie case of FMLA retaliation, then, Sura must establish a causal connection between the two.

According to Defendants, Sura merely has weak temporal evidence to support her FMLA retaliation claim. Defendants point out that, standing alone, only a very close temporal proximity between the protected activity and an adverse employment action will suffice to show causality. Smith, 302 F.3d at 832; Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999) (stating that a gap in time "weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint") (citation omitted). In this case, Defendants contend that, because Sura requested her FMLA leave in August 2000 but was not affected by an adverse employment action until February 2001, the temporal interval is too great to support a finding of causation.

At the outset, the Court finds that Sura has adduced more than temporal evidence that she was retaliated against for taking FMLA leave. Specifically, Hanson told Sura that she held grudges. Additionally, Pankow testified that Hanson was disconcerted by the length of

Sura's leave. Finally, Hanson was concerned that Sura might not be able to handle her return from leave. This testimonial evidence, paired with the fact that Sura was informed that her salary was being reduced only two days after returning from her leave and her salary was actually reduced less than a month after her return from leave, suffices to create a genuine issue of material fact as to whether the Bank retaliated against her for exercising her rights under the FMLA.

Pursuant to McDonnell Douglas, then, the Bank must produce evidence that a legitimate nondiscriminatory reason for the adverse employment action exists. The Bank has met this burden by coming forward with a reason other than retaliation for Sura's reduction in salary–the economic downturn of 2000 and the Bank's refocused attention on commercial loan quality rather than quantity. Accordingly, the burden shifts back to Sura to establish that this proffered nondiscriminatory reason is false and is a mere pretext for retaliation. Sura easily meets this burden. She has produced Pankow's testimony that Hanson admitted she was planning on reducing Sura's salary in an effort to force Sura to quit. In light of Hanson's other statements, this admission could lead a reasonable juror to find that the Bank's proffered nondiscriminatory justification for lowering Sura's salary is pretextual. Accordingly, Sura's claim for retaliation under the FMLA survives summary judgment.

### D. Aiding and Abetting Discrimination

Sura claims that Hanson individually violated the MHRA by aiding and abetting the Bank's discrimination and retaliation against her. The MHRA provides that "[i]t is an unfair

discriminatory practice for any person . . . [i]ntentionally to aid, abet, incite, compel, or coerce a person to engage in any of the practices forbidden by this chapter." Minn. Stat. § 363.03, subd. 6. Because the Court finds that Sura's discrimination and retaliation claims under the MHRA fail as a matter of law, Sura's aiding and abetting claim must also fail.

**E. Tortious Interference**

Lastly, Sura claims that Hanson tortiously interfered with her employment at the Bank. In Minnesota, an at-will employee may maintain a tortious interference with contract claim against a third party who wrongfully causes the termination of the employee's job. Nordling v. N. States Power Co., 478 N.W.2d 498, 505 (Minn. 1991). To succeed on such a claim, the plaintiff must show that: (1) a contract existed; (2) the alleged wrongdoer knew of this contract; (3) the alleged wrongdoer intentionally procured the breach of the contract; (4) the alleged wrongdoer's actions were without justification; and (5) the plaintiff has suffered damages. See Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994). In the employment context, however,

> a company officer, agent or employee is privileged to interfere with or cause a breach of another employee's employment contract with the company if that person acts in good faith, whether competently or not, believing that his actions are in furtherance of the company's business. This privilege may be lost, however, if the defendant's actions are predominantly motivated by malice and bad faith, that is, by personal ill-will, spite, hostility or a deliberate intent to harm the plaintiff employee.

Nordling, 478 N.W. 2d at 507.

Here, there is no doubt that Sura had an employment relationship with the Bank and

that Hanson knew of this relationship. It is also clear that Sura has suffered damages as a result of the Bank's adverse employment action against her.[3] Thus, determining whether summary judgment is appropriate on Sura's tortious interference claim hinges on whether Hanson's actions were justified or, in other words, on whether Hanson acted out of malice or bad faith.

The Court finds that Sura has adduced evidence of comments made by Hanson that, if believed by a jury, could suffice to demonstrate that Hanson harbored ill-will towards Sura. Specifically, Sura has produced Pankow's testimony that Hanson considered Sura's leave too long and wanted to force Sura to quit by lowering her salary. Accordingly, Sura has created a genuine issue of material fact as to whether Hanson was acting out of malice or ill-will, and thus, her tortious interference claim survives summary judgment.

**CONCLUSION**

For the foregoing reasons, and upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Clerk Doc. No. 15) is **GRANTED in part and DENIED in part** as follows:

1. Counts I, II, IV, V, and VI of the Complaint are **dismissed with prejudice**;
2. Count III of the Complaint, insofar as it states a claim for discrimination under

---

[3] Although Sura was not "terminated" from the Bank, she maintains that the Bank's actions altered the conditions of her employment substantially enough that a reasonable person would have deemed continued employment at the Bank intolerable. Because the Bank does not counter this argument, the Court accepts it for the purposes of this Motion.

the FMLA, is **dismissed with prejudice**;

3. To the extent that it states a claim for retaliation under the FMLA, Plaintiff may proceed to trial on Count III of the Complaint; and

4. Plaintiff may proceed to trial on Count VII of the Complaint.

Dated: December 18, 2002

Paul A. Magnuson
United States District Court Judge